# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br>NEW CENTURY TRS HOLDINGS, INC.<br>a Delaware corporation, *et al.*,<br><br>        Debtors.<br>---------------------------------------------------------------x<br>THE NEW CENTURY LIQUIDATING TRUST<br>AND REORGANIZED NEW CENTURY<br>WAREHOUSE CORPORATION, by and through<br>Alan M. Jacobs, Liquidating Trustee and Plan<br>Administrator,<br><br>        Plaintiff,<br><br>     --against--<br><br>ROBERT K. COLE, BRAD A. MORRICE,<br>EDWARD F. GOTSCHALL, JOHN DOE, JANE<br>DOE, MARILYN A. ALEXANDER, HAROLD A.<br>BLACK, FREDRIC J. FORSTER, DONALD E.<br>LANGE, WILLIAM J. POPEJOY, MICHAEL M.<br>SACHS, RICHARD A. ZONA, DAVID EINHORN,<br>PATRICK FLANAGAN, KEVIN M. CLOYD,<br>PATTI M. DODGE, JOSEPH F. ECKROTH, JR.,<br>STERGIOS THEOLOGIDES, EG ENTERPRISES,<br>PACIFIC FINANCIAL SERVICES, INC., ZONA<br>FINANCIAL, LLC., GREENLIGHT CAPITAL,<br>INC., and F&A FORSTER FAMILY REVOCABLE<br>TRUST,<br><br>        Defendants.<br>---------------------------------------------------------------x | Chapter 11<br><br>Case No. 07-10416 (KJC)<br><br>Jointly Administered<br><br>Adv. Proc. No. _____ |

## ADVERSARY PROCEEDING COMPLAINT

Plaintiff, The New Century Liquidating Trust and Reorganized New Century Warehouse Corporation (together, the "Trust"), by and through Alan M. Jacobs, as Liquidating Trustee and Plan Administrator (the "Trustee" or "Plaintiff"), by his co-counsel, Hahn & Hessen LLP and Benesch, Friedlander, Coplan & Aronoff LLP, hereby files this adversary proceeding complaint and, in support thereof, alleges:

## Nature and Summary of the Proceeding

1.     This proceeding is brought to hold the above-captioned individual defendants, each of whom served as a senior officer and/or director of New Century Financial Corporation ("New Century") and one or more of its operating subsidiaries (together with New Century, the "Company"), accountable for, among other things: (i) breach of their fiduciary and other duties and obligations to the Company; (ii) waste of Company assets; and (iii) their resulting receipt of personal benefits, all of which have caused substantial monetary damages to the Company.

2.     This proceeding is also brought to recover payments made by the Company to or on behalf of certain of the individual defendants or entities they controlled that constituted preferential and/or fraudulent transfers, or that unjustly enriched them.

3.     Each of the individual defendants, by virtue of his or her position as a senior officer and/or director, owed duties and obligations to the Company, including fiduciary duties of loyalty, good faith and the exercise of due care and diligence in their management, supervision and administration of the Company's affairs.  They were also required to exercise their duties and obligations in the Company's best interests, as well as to preserve and protect the Company's assets.

4.     Beginning in 2004 and continuing until the Company's bankruptcy filing in April 2007 and subsequent liquidation, the individual defendants acted in at least reckless, gross and knowing violation of their duties and obligations to the Company, if not conscious disregard thereof, by among other things:

   (a)     knowingly directing the Company to originate and purchase high-risk loan products made to unqualified borrowers who were known to present substantial risks to the Company;

   (b)     failing to take action in furtherance of their duties and obligations even after they became aware that the high-risk loans they approved were resulting in continuing and increasing losses;

(c)  failing to take action to remedy or otherwise address known and continuing deficiencies in the Company's underwriting and loan origination practices and processes;

(d)  failing to remedy or otherwise address the reasons for the continuing and increasing "investor kick-outs";

(e)  failing to implement controls that were known to be necessary to protect the Company against the risks it faced;

(f)  failing to implement an effective system of internal controls over financial reporting that led to the Company's 2007 announcement of the need to restate its financial statements; and

(g)  knowingly taking actions that deprived the Company of the liquidity necessary to operate its business.

5.  The individual defendants' breach of their duties and obligations damaged the Company as well as allowed them to receive benefits in the form of bonuses, dividends, stock sales and other monetary remuneration in excess of the amount they would have received had they properly discharged their duties and responsibilities.

## Jurisdiction, Venue and Standing

6.  On April 2, 2007 (the "Petition Date"), New Century and its operating subsidiaries (collectively, the "Debtors")[1] commenced their respective bankruptcy cases under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

---

[1] The Debtors including New Century are the following entities: New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporation, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership; and New Century Warehouse Corporation ("NCW"), a California Corporation. NCW filed its petition on April 3, 2007 and by order dated August 7, 2007, the Bankruptcy Court ordered the NCW chapter 11 case to be jointly administered along with the chapter 11 cases of the other Debtors.

7. The Debtors included New Century Mortgage Corporation ("NCMC"), Home123 Corporation ("Home123") and New Century Capital Corporation ("NC Capital").

8. On July 15, 2008, the Bankruptcy Court entered an order (the "Confirmation Order") that confirmed The Second Amended Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors, dated as of April 23, 2008 (as supplemented, amended or modified, the "Plan").

9. The Confirmation Order was subsequently amended by order of the Bankruptcy Court, dated July 23, 2008.

10. Jurisdiction over this adversary proceeding is based on 28 U.S.C. §§ 157(a) and 1334 and Article 15, Section A of the Plan.

11. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (F), (H) and (O).

12. Venue in this Court is proper pursuant to 28 U.S.C. § 1409(a).

## The Parties and Related Entities

### A. Plaintiff

13. On August 1, 2008, the Plan became effective. Pursuant to the terms thereof, the New Century Trust Agreement was executed, thereby creating the Trust and appointing Alan M. Jacobs as Trustee.

14. Pursuant to the Plan, the Debtors' assets, including the claims alleged herein against the defendants, were assigned and transferred to the Trust.

15. The Trustee is vested by the Plan with the authority to pursue the claims alleged herein for the Trust's benefit.

16. The Trustee has a principal place of business at c/o AMJ Advisors LLC, 999 Central Avenue, Suite 208, Woodmere, New York 11598.

**B.** **Inside Director Defendants**

17.     New Century was a Maryland corporation with a principal place of business in Irvine, California.

18.     Upon information and belief, defendant Robert K. Cole ("Cole") was a co-founder of New Century.  Cole served in various capacities at New Century, including as (a) Chief Executive Officer ("CEO") from December 1995 to July 2006, (b) President from December 1995 to December 2005, and (c) Chair of its board of directors (the "Board") from December 1995 to December 31, 2006, after which time he continued as a member of the Board.

19.     Upon information and belief, Cole also served in various executive and directorial capacities with several of New Century's operating subsidiaries, including as a director of NCMC from November 1995 to April 2005.

20.     Upon information and belief, Cole is a resident of the State of California.

21.     Upon information and belief, defendant Edward F. Gotschall ("Gotschall") was a co-founder of New Century.  Gotschall served in various capacities at New Century, including as (a) one of its directors from November 1995 through September 2007, (b) Chief Financial Officer ("CFO") from August 1998 to July 2004, and (c) Vice Chairman of Finance from July 2004 until June 2006.

22.     Upon information and belief, Gotschall also served in various executive and directorial capacities with several of New Century's operating subsidiaries, including that of (a) director of NCMC (August 1995 to April 2005), (b) Executive Vice President ("EVP") of NCMC (December 1995 to March 2004), (c) CFO of NCMC (August 1995 to February 2002), and (d) CFO and director of NC Capital.

23.     Upon information and belief, Gotschall is deceased and at the time of his death was a resident of the State of California.  Upon information and belief, Gotschall's estate has not

yet been opened and an estate representative not appointed. The Plaintiff will take the appropriate steps to identify Gotschall's estate representative when appointed. Until that time, such estate representative is referred to herein as "JOHN DOE or JANE DOE".

24. Upon information and belief, defendant Brad A. Morrice ("Morrice") was a co-founder of New Century. Morrice served in various positions at New Century, including as (a) one of its directors from November 1995, (b) CEO from July 1, 2006 and President from January 1, 2006, (c) Vice Chairman of the Board from December 1996, and (d) Chief Operating Officer ("COO") from January 2001 until July 2006.

25. Upon information and belief, Morrice also served in various executive and directorial capacities with several of New Century's operating subsidiaries, including as (a) CEO and a director of NCMC, (b) chairman of the board of directors and CEO of Home123, and (c) chairman of the board of directors and CEO of NC Capital.

26. Upon information and belief, Morrice is a resident of the State of California.

27. Cole, Morrice and Gotschall are collectively referred to herein as the "Inside Directors" or "Inside Director Defendants".

## C.  **Independent Director Defendants**

28. In addition to Cole, Morrice and Gotschall, New Century's Board at all relevant times consisted of at least seven independent directors.

29. Upon information and belief, defendant Marilyn A. Alexander ("Alexander") served as a director of New Century from May 2005 until April 2007. She was a member of the Board's audit committee (the "Audit Committee") from May 2005, and Chair of the Board's finance committee (the "Finance Committee") from January 2006.

30. Upon information and belief, Alexander is a resident of the State of California.

31.     Upon information and belief, defendant Harold A. Black ("Black") served as a director of New Century from June 2004 until after the Petition Date.

32.     Upon information and belief, Black is a resident of the State of Tennessee.

33.     Upon information and belief, defendant Fredric J. Forster ("Forster") served as a director from July 1997 until after the Petition Date.  He was Lead Independent Director from September 2005 and Non-Executive Chairman of the Board from January 1, 2007.  Forster also served as a member of the Audit Committee from 2000 through 2005.

34.     Upon information and belief, Forster is a resident of the State of California.

35.     Upon information and belief, defendant Donald E. Lange ("Lange") served as a director from November 2002 until after the Petition Date.  He was a member of the Audit Committee from November 2002.

36.     Upon information and belief, Lange is a resident of the State of California.

37.     Upon information and belief, defendant William J. Popejoy ("Popejoy") served as a director from 2002 until June 5, 2006.

38.     Upon information and belief, Popejoy is a resident of the State of California.

39.     Upon information and belief, defendant Michael M. Sachs ("Sachs") served as a director from November 1995 until after the Petition Date and was the Company's longest serving independent director.  Sachs was a member of the Audit Committee from 1998 through 2007, serving as its Chair from 2000 through 2006.  He also served as a member of the Finance Committee from January 2006.

40.     Upon information and belief, Sachs is a resident of the State of California.

41.     Upon information and belief, defendant Richard A. Zona ("Zona") served as a director from June 2000 until after the Petition Date.  Zona served as a member of the Audit Committee from 2000 and as a member of the Finance Committee from January 2006.

42.     Upon information and belief, Zona is a resident of the State of Minnesota.

43.     Upon information and belief, defendant David Einhorn ("Einhorn") served as a director and as a member of the Finance Committee from March 31, 2006 until March 7, 2007.

44.     Upon information and belief, Einhorn is the President of Greenlight Capital, Inc. ("Greenlight Capital"), a New York investment management firm.  At one time, Greenlight Capital was New Century's largest shareholder.  After threatening a proxy fight during 2005, Einhorn reached a compromise with other Board members that resulted in his appointment as a director.

45.     Upon information and belief, Einhorn is a resident of the State of New York.

46.     Alexander, Black, Forster, Lange, Popejoy, Sachs, Zona and Einhorn are collectively referred to herein as the "Independent Directors" or the "Independent Director Defendants".

47.     At all times relevant to the claims set forth herein, the Audit Committee was comprised of four Independent Directors:  Alexander, Lange, Sachs (Chair), and Zona.

48.     The Independent Directors and Inside Directors are collectively referred to herein as the "Directors", "Director Defendants" or the "Board."

**D.     <u>Officer Defendants</u>**

49.     Upon information and belief, defendant Patrick Flanagan ("Flanagan") served as New Century's EVP beginning in August 1998.

50.     Upon information and belief, on December 27, 2005 Flanagan entered into an employment consulting agreement with New Century whereby he commenced a six-month leave

of absence on January 1, 2006, after which time his employment terminated and he would continue to receive $76,445 per month in compensation for an additional 18-month period.

51.　　Upon information and belief, Flanagan also served as (a) EVP and COO of NCMC (1997 to February 2002), (b) President of NCMC and Head of Loan Production and Secondary Marketing (February 2002 to February 2006), (c) director of NCMC (May 1997 to February 2006), and (d) CEO and director of NC Capital until February 2006.

52.　　Upon information and belief, Flanagan is a resident of the State of California.

53.　　Upon information and belief, defendant Kevin M. Cloyd ("Cloyd") served as New Century's EVP since March 2004 and, upon Flanagan's departure from the Company in 2006, Cloyd assumed his role as the officer in charge of Loan Production and Secondary Marketing.

54.　　Upon information and belief, Cloyd also served as (a) EVP of NCMC since March 2004, (b) a director of NCMC since February 2006, (c) President of NC Capital since February 2002, (d) a director of NC Capital since December 2002, and (e) EVP of Home123 from August 2005.

55.　　Upon information and belief, Cloyd is a resident of the State of California.

56.　　Upon information and belief, defendant Patti M. Dodge ("Dodge") served as New Century's EVP since March 2004 and as its CFO from July 2004 to November 14, 2006. In November 2006, Dodge became the EVP of Investor Relations.

57.　　Dodge previously served in other capacities at New Century, including as VP and Controller (September 1996 to February 1999); SVP and Controller (February 1999 to February 2002); and SVP and CFO (July 2004 to November 2006).

58.　　Upon information and belief, Dodge also served as (a) EVP and CFO of NCMC since March 2004, (b) SVP and CFO of NCMC from February 2002 to March 2004, (c) a

director of NCMC, (d) CFO of Home123 from March 2004, (e) a director of Home123 from February 2006, and (f) a director of NC Capital.

59.     Upon information and belief, Dodge is a resident of the State of California.

60.     Upon information and belief, defendant Joseph F. Eckroth, Jr. ("Eckroth") was hired by New Century in July 2005 as SVP and Chief Information Officer ("CIO") and promoted to EVP in March 2006.

61.     Upon information and belief, Eckroth also served as EVP and COO of NCMC since January 2006.

62.     Upon information and belief, Eckroth is a resident of the State of California.

63.     Upon information and belief, defendant Stergios Theologides ("Theologides") served as New Century's EVP - Corporate Affairs from March 2003, General Counsel since April 1998, and Corporate Secretary from May 1999 until May 2005.

64.     Upon information and belief, Theologides also served as (a) a director and EVP-Corporate Affairs, Senior Legal Counsel and Secretary of NCMC, (b) Corporate Secretary of Home123 from March 2004, and (c) EVP and a director of NC Capital.

65.     Upon information and belief, Theologides is a resident of the State of California.

66.     Defendants Cloyd, Dodge, Eckroth, Flanagan, Theologides, Cole, Morrice and Gotschall are collectively referred to as the "Officers" or "Officer Defendants."

**E.     The Subsidiary Officer and Director Defendants**

67.     Upon information and belief, and at all times relevant to the claims set forth herein, each of the Officer Defendants and Inside Directors also served as an officer and/or director of one or more of New Century's operating subsidiaries, including NCMC, Home123 and NC Capital.

68.     Upon information and belief, NCMC was a California corporation with a principal place of business in Irvine, California.  NCMC was the operating subsidiary responsible for the Company's wholesale mortgage loan originations and purchases, and generated the majority of the Company's mortgage loan production volume.

69.     Upon information and belief, at all times relevant to the claims set forth herein and as described above, the following individuals served as officers of NCMC:  Cloyd, Dodge, Eckroth, Flanagan, Gotschall, Morrice, Flanagan, and Theologides (collectively, the "NCMC Officer Defendants" or "NCMC Officers").

70.     Upon information and belief, at all times relevant to the claims set forth herein and as described above, the following individuals served as directors of NCMC:  Cole, Morrice, Gotschall, Cloyd, Dodge, Flanagan, and Theologides (collectively the "NCMC Board Defendants" or "NCMC Board"; and together with the NCMC Officer Defendants, the "NCMC Defendants").

71.     Upon information and belief, Home123 was a California corporation with a principal place of business in Irvine, California.  Home123 was the operating subsidiary responsible for the Company's retail origination and purchase of mortgage loans.

72.     Upon information and belief, at all times relevant to the claims set forth herein and as described above, the following individuals served as officers of Home123:  Morrice, Dodge, Cloyd, and Theologides (collectively the "Home123 Officer Defendants" or "Home123 Officers").

73.     Upon information and belief, at all times relevant to the claims set forth herein and as described above, the following individuals served as directors of Home123:  Morrice and

Dodge (collectively, the "Home123 Board Defendants" or "Home123 Board," and together with the Home 123 Officer Defendants, the "Home123 Defendants").

74.     Upon information and belief, NC Capital was a California corporation with a principal place of business in Irvine, California. NC Capital was the operating subsidiary responsible for the Company's secondary mortgage marketing activities, including whole loan sales and securitizations.

75.     Upon information and belief, at all times relevant to the claims set forth herein and as described above, the following individuals served as officers of NC Capital: Morrice, Gotschall, Flanagan, Cloyd, and Theologides (the "NC Capital Officer Defendants" or "NC Capital Officers").

76.     Upon information and belief, at all times relevant to the claims set forth herein and as described above, the following individuals served as directors of NC Capital: Morrice, Gotschall, Flanagan, Cloyd, Dodge, and Theologides (the "NC Capital Director Defendants" or "NC Capital Directors", and together with the NC Capital Officer Defendants, the "NC Capital Defendants").

77.     The NCMC, Home 123 and the NC Capital Defendants are collectively referred to as the "Subsidiary Defendants."

78.     The Officer Defendants, Director Defendants and Subsidiary Defendants are collectively referred to herein as the "Defendants."

F.     **Duties of the Defendants**

79.     From its inception in 1995 through to the Petition Date, New Century's co-founders Cole, Morrice and Gotschall, in addition to serving as members of the Board (with Cole serving as its Chair until the end of 2006), each had senior management responsibilities.

80.     New Century's top executive positions were those of President and CEO.

81.     Cole served as President and CEO from 1995 until 2006.

82.     Morrice succeeded Cole as President in January 2006 and as CEO in July 2006.

83.     Gotschall served as New Century's CFO until July 2004, when he was named to the position of Vice Chairman-Finance.

84.     Between 2004 through to the Petition Date, Cloyd, Dodge, Eckroth, Flanagan, and Theologides were among the top-level executive officers that reported directly to the President and CEO.

85.     Eckroth took over the position of COO from Morrice in June 2006.  As COO, Eckroth (as was Morrice before him) was responsible for the Company's day-to-day administration and business operations.

86.     Dodge held the position of CFO from July 2004 until her transfer to Investor Relations in November 2006.  As CFO, Dodge was responsible for all financial, accounting and tax functions, including the Company's financial planning, forecasting, record-keeping and reporting to senior management and the Board.

87.     Theologides held the position of General Counsel and EVP of Corporate Affairs, and was responsible for all of the Company's legal, regulatory affairs and compliance matters.

88.     Flanagan was the head of the Loan Production and Secondary Marketing Department until his departure in December 2005, at which time Cloyd assumed that position. Among other things, Flanagan and Cloyd supervised the Company's mortgage loan origination process, including the credit and underwriting functions, secondary marketing activities, quality control processes, and information technology infrastructure for loan originations.

89.     The Director Defendants were responsible to oversee and monitor the business and operations of New Century and the Officers' management thereof.

90.     The Subsidiary Defendants (each of whom is also an Officer Defendant) were each a senior officer and/or director of one or more subsidiaries and responsible for the management, oversight and monitoring of the business and operations of such subsidiaries.

91.     Defendants, by virtue of their positions of control and authority were required to, among other things:

(a)     take such actions as were in the best interests of the Company;

(b)     prevent waste of the Company's assets;

(c)     discharge their duties and obligations in a diligent, honest, and prudent manner with the care an ordinarily prudent person would use under similar circumstances;

(d)     remain informed as to how the Company conducted its operations and upon notice of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices; and

(e)     address the known risks of the Company's business as necessary to preserve and protect the Company and its assets.

92.     These duties, obligations and responsibilities, among others, were owed by the Officer Defendants and Board defendants to New Century and the Company; by the NCMC Defendants to New Century, NCMC and the Company; by the Home123 Defendants to New Century, Home123 and the Company; and by the NC Capital Defendants to New Century, NC Capital and the Company.

93.     As further alleged herein, the Defendants breached their duties, obligations and responsibilities to New Century, NCMC, Home123, NC Capital, and the Company by acting with at least gross negligence and in reckless disregard, if not conscious disregard, in the discharge thereof.

94.     The Defendants each directed, approved, ratified and/or condoned the wrongful acts and omissions giving rise to the claims asserted herein.

14

95. The Defendant's wrongful acts and omissions were to the detriment of, and caused damage to, New Century, NCMC, Home123, NC Capital, and the Company.

**G.     Preference Defendants**

96. Upon information and belief, defendant EG Enterprises ("EG Enterprises") is a California corporation with a principal place of business in California.

97. Upon information and belief, Pacific Financial Services, Inc. ("Pacific Financial") is a California corporation with a principal place of business in Torrance, California.

98. Upon information and belief, Zona Financial, LLC ("ZF LLC") is a Minnesota limited liability corporation with a principal place of business in Minneapolis, Minnesota.

99. Upon information and belief, Greenlight Capital is a New York corporation with a principal place of business in New York, New York.

100. Upon information and belief, the F&A Forster Family Revocable Trust ("F&A Family Trust") is a trust organized under the laws of California with a principal place of business in California.

101. Einhorn, Greenlight Capital, Pacific Financial, Lange, Gotschall, EG Enterprises, Forster, F&A Family Trust, Black, Alexander, Sachs, Cole, ZF LLC, Zona, and Cloyd are collectively referred to as the "Preference Defendants."

<strong><u>Allegations Common to Claims for Relief</u></strong>

**A.     New Century's Founding**

102. New Century was founded in 1995 by Cole, Morrice and Gotschall, and became a publicly traded company in 1997.

103. From its inception in 1995 through to its demise in 2007, New Century operated through its subsidiaries as a mortgage finance company.

104.     The Company originated and purchased residential mortgage loans throughout the country.  It focused on individual borrowers whose borrowing needs were not met by traditional mortgage lenders.

105.     The Company financed its origination and purchase of mortgage loans through credit facilities provided by various financial institutions and from its working capital.

106.     The mortgage loans that the Company originated or purchased were sold by it on the secondary mortgage market.  Typically, such sales took place within thirty to sixty days of the date the sold loan was originated or purchased.

107.     As further explained below, the Company in or about 2003 began holding for investment a portion of the loans it originated or purchased.

108.     The Company also serviced mortgage loans it originated and purchased.  Servicing included responsibilities such as the collection of the borrowers' monthly payments and disbursement of those payments to the appropriate party; paying taxes and insurance from escrowed funds; and pursuing payment defaults and foreclosures.

109.     Between its founding and 2003, the Company's annual origination and purchase of mortgage loans grew from $357,000 in 1996 to $27 billion in 2003.

**B.     New Century's Qualification as a REIT**

110.     In 2004, the Board approved the change of the Company's corporate structure to allow it to qualify as a Real Estate Investment Trust ("REIT").

111.     The Internal Revenue Code allows a corporation to elect to be treated as a REIT and thereby not subject to federal income taxes on REIT taxable income that it distributes to its shareholders.

112.     New Century, to qualify as a REIT, was required to meet the REIT requirements and distribute at least 90% of its REIT taxable income to its shareholders.

113.     New Century, by virtue of its status as a REIT, was not required to distribute to its shareholders the taxable income of its "taxable REIT subsidiaries", such as the income generated from the sale and servicing of mortgage loans, which was subject to federal income taxes.

114.     The primary, if not sole, source of New Century's taxable REIT income following its conversion to a REIT was its income from its "REIT Portfolio".

115.     The REIT Portfolio consisted primarily, if not entirely, of loans that were securitized by New Century in transactions structured as financings and carried on New Century's balance sheet as Loans Held For Investment ("LHFI").

116.     New Century purchased the loans in its REIT Portfolio from its taxable REIT subsidiaries.

117.     New Century's REIT Portfolio, as publicly reported by New Century, exceeded $16 billion at the end of 2005 and $14 billion as of September 30, 2006.

118.     New Century, as reported in its Form 10-K for 2005, required "substantial capital" in order to purchase and hold mortgage loans in its REIT Portfolio.  A source of such capital included borrowings from third-party lenders and from its taxable REIT subsidiaries.

119.     In addition to the substantial capital needed to build and hold its REIT Portfolio, New Century, as reported in its Form 10-K for 2005, needed "substantial capital" to pay the required REIT dividends.

120.     The REIT structure severely limited the Company's ability to accumulate capital for its business operations.

121.     Dodge, in a memo she sent to the Board in July 2005, wrote, "[m]anagement's number one focus is to insure that the Company increased its dividend by 10% per year."

122.	In furtherance of that "focus", New Century's quarterly dividend was increased by 5 cents per share in each quarter of 2005 and 2006 (going from $1.50 in the first quarter of 2005 to $1.85 in the fourth quarter of 2006).

123.	Upon information and belief, New Century in 2005 and 2006 paid dividends in excess of $800 million.

124.	Upon information and belief, between the fourth quarter of 2005 and the third quarter of 2006 and pursuant to share repurchase plans approved by the Board, New Century bought back nearly $100 million of its stock on the open market.

125.	New Century's buy-back of stock and payment of dividends negatively impacted the liquidity the Company needed to operate its business.

C.	**The Company's Increased Loan Production**

126.	The mortgage loans originated and purchased annually by the Company between 2003 and 2006 totaled:

| Year-end 2003 | $27 billion |
| Year-end 2004 | $42 billion |
| Year-end 2005 | $56 billion |
| Year-end 2006 | $60 billion |

127.	As shown by the preceding paragraph, the mortgage loans originated and purchased by the Company on an annual basis increased dramatically between 2003 and 2004, and by 2005 had more than doubled the amount originated and purchased in 2003.

128.	The Company's growth in loan production between 2003 and 2006 was the direct result of the Defendants' emphasis on increased loan production.

129.     The Company's growth in loan production between 2003 and 2006 was also the consequence of the Defendants' introduction of increasingly riskier and non-traditional loan products offered to an increasing number of unqualified borrowers.

**D.     The Company's Loan Origination Process**

130.     Mortgage loans were originated and purchased by the Company through two "divisions" – the "Wholesale Division" operated by NCMC and the "Retail Division" operated by Home123.

131.     NCMC was responsible for approximately 85% of the mortgage loans originated or purchased by the Company.  It operated through a network of independent brokers and correspondent lenders.

132.     Home123 was responsible for approximately 15% of the mortgage loans originated by New Century.  It originated loans through direct dealings with borrowers.

133.     In a "wholesale" mortgage loan origination, independent brokers found potential borrowers and assisted them in preparing the loan applications.  Those applications were then forwarded to the Company's account executives, who together with an account manager reviewed the application to determine whether it was supported by the proper documentation.

134.     The account manager would then forward the application and accompanying documentation to the Company's underwriters for the loan's approval.  As part of this process, independent appraisals would be obtained and reviewed by the Company's review appraisers.

135.     Once a mortgage loan was approved, the loan documents would be executed and forwarded to a Company funding officer.  That individual was to ensure that all loans were properly documented and executed, and the loan file complete, before the loan was funded.

136.     The Company's "retail" origination process was substantially similar to that of the "wholesale" origination process with the exception that the borrower's initial contact was with the Company.

**E.     The Company's Secondary Mortgage Market Activities**

137.     The mortgage loans that the Company originated and purchased were sold or securitized by it on the secondary market through NC Capital in one of three ways:  (a) whole loan sales; (b) securitizations structured as a sale; and (c) securitizations structured as a financing.

138.     In a whole loan sale, the Company sold a pool of mortgage loans to a loan purchaser (commonly referred to as the investor), usually at a premium to the loans' par value. For example, the Company might sell a $100,000 mortgage loan for $102,600, in which case New Century would receive a 2.60% premium to par value.

139.     The difference between the net proceeds received by the Company from the sale and its costs of originating or purchasing the mortgage loans sold would be recognized by the Company as a gain at the time of sale.

140.     In a securitization structured as a sale, the Company sold a pool of mortgage loans to a trust in exchange for cash and, as with a whole loan sale, recognized a gain on sale.  The trust raised the cash paid to the Company by selling certificates representing senior interests in the underlying loans in the trust.  In addition, the Company retained a right to cash flows or other assets that may remain in the trust after the trust's payment of principal and interest due the senior interests and its expenses.  The Company's interest in the trust was known as a "residual interest."

141.     Following its conversion to a REIT, the Company developed its REIT Portfolio through securitizations structured as a financing.  The financing for these loans was largely in the

form of securitized bonds issued in the loan securitization process. New Century recognized income from its REIT Portfolio as interest payments on the underlying loans that were received from the loan's borrower, rather than (as in the case of whole loan sales or securitizations structured as a sale) recognizing a gain on sale.

## F.    Kick-outs and Loan Repurchases

142.    When it put together a pool of mortgage loans to be offered for sale, the Company sent data about the loans contained in the pool to potential investors. Those potential investors, upon review of such data, could then reject loans from the pool that they were unwilling to purchase.

143.    Mortgage loans rejected by an investor were referred to as "kick-outs". When a loan was "kicked-out" the Company either attempted to find another purchaser for the loan (typically at a lower price) or placed it in the Company's own portfolio.

144.    Commencing in at least 2004, the primary reasons for investor kick-outs of the Company's mortgage loans included defective appraisals, incorrect credit reports, and/or missing loan documentation.

145.    Investor "kick-outs" resulted in at least millions of dollars in additional expenses for the Company and negatively affected the Company's liquidity.

146.    In whole loan sales and securitizations structured as a sale, the Company made representations and warranties to the purchaser (*i.e.*, the investor or trust) regarding the characteristics and origination process of the mortgage loans sold.

147.    These representations generally included the Company's commitment to repurchase or substitute a mortgage loan in the event of an Early Payment Default ("EPD") – *i.e.*, the mortgage borrower's default within several months following the loan's sale – or in the event

of a material breach of the representations or warranties made by the Company regarding the loan's characteristics and origination.

148.    When repurchasing a mortgage loan, such as in the event of an EPD, the Company had to repay the investor the purchase price (including any "premium" paid by the investor over the loan's face value) as well as any past-due interest on the loan.  The Company would then seek to find another purchaser for the loan (typically, at a price less than the loan's face value).

149.    The Company established a reserve allowance for loan repurchase losses (the "repurchase reserve").

150.    All mortgage loans that were not sold promptly by the Company after funding, including investor kick-outs, and loans repurchased by the Company after sale, negatively impacted the Company's liquidity.

## G.    The Dysfunctional Relationship Between the Board and Officer Defendants

151.    By 2005, the Defendants were aware of numerous and troubling trends in the Company's operations that demanded immediate action.  These "red flags" included, among others, the following:

> (a)    the Company's increased origination of riskier non-traditional loan products and its deficient underwriting practices were resulting in increased defaults and delinquencies;
>
> (b)    the Company was experiencing increased kick-outs and repurchase claims;
>
> (c)    the Company was facing increased competition from other lenders, interest rates were rising and property value appreciation was leveling off;
>
> (d)    the Company's revenue growth was slowing and its profit margins were narrowing; and
>
> (e)    the Company's short-term liquidity position was deteriorating.

152.    In addition, amid these pressing issues, a mutual lack of trust and confidence existed among the Independent Director Defendants and the Officer Defendants that impaired, if not prevented, them from discharging their duties in furtherance of the Company's best interests.

153.    This distrust stemmed, in part, from a belief by the Independent Directors that they were "left out of crucial strategic decision[s]". In his preparatory notes for an August 2005 Board meeting, Forster noted that "[t]he EC [Officer Defendants] itself did not function – very poor communication and a fundamental misread as to director feelings. Bob [Cole] agrees to its ineffectiveness. . . ."

154.    This distrust and lack of confidence continued into and throughout 2006. In preparatory notes for a June 2006 Board meeting, it was noted by Forster that, "[w]e are in the midst of trying to develop a new working relationship between the Board and the EC [Officer Defendants] – the EC [Officer Defendants] is watching us carefully to see just how functional we will be, and how we perform is viewed as a very crucial issue to future NEW [New Century] success. Frankly, base[d] on recent history many of them are not optimistic."

155.    Several Independent Directors were concerned with what they believed was the lack of reliable financial forecasting received from finance personnel that the Board considered necessary for them to make informed decisions as directors. In a September 9, 2006 email, Morrice addressed Forster's concerns and wrote: "[a]gain, I am concerned about the current depth and morale of our finance team, but this is not news. Indeed, the team is quite aware of the lack of confidence at the Board level."

156.    Einhorn had earlier informed Forster, in an August 13, 2006 email, that, "I am very concerned about the finance staff."

157.     Conversely, some of the Officer Defendants believed that the Independent Directors were misguided and involved themselves unnecessarily in issues outside their authority.  As Gotschall stated in a March 21, 2006 email to Forster, "I do not agree with the role the Board is playing within this Company.  Oversight has been replaced with direct management, largely, I believe, because several members of the Board have lost confidence in management and convinced other Board members to question our ability to be trusted."

158.     Gotschall further wrote in that March 21, 2006 email, "[a]ctions speak much louder than words, and despite the Board's continued assertion that it believes in management, the actions taken by the Board simply do not support this conclusion. . . . When certain members of the Board don't like the conclusion, even though analytics support that conclusion, they simply disregard the analytics and stall the process . . . we have a trust issue. . .".

159.     In late 2005, Zona prepared two draft "resignation" letters (although Zona continued as a Board member until after the Petition Date).  These letters addressed several of Zona's concerns, including those as to the "integrity of Management" and "whether or not Management has been providing the board with full disclosure."

160.     Describing the Company's management team as "dysfunctional", Zona wrote:

[I]t was wrong for Management to previously lead us to believe that our shareholders were strongly in favor of the balance sheet strategy and conversion to a REIT when they knew that our largest shareholder was opposed to the balance sheet strategy.

\*       \*       \*

The Current Management team appears to be dysfunctional.  We have gone from Management telling us a short time ago that Pat Flanagan is a star and therefore he was promoted to a "full partner", to a person that is being terminated effective immediately.

\*       \*       \*

24

> In my view, Ed [Gotschall] does not respect the outside
> directors, . . . and is a disruptive force within the Company. He
> has during the last two years stated he is going to leave the
> Company. Instead he had stayed and essentially become an
> executive without portfolio who still has tremendous influence on
> the entire Management team and who encourages a culture where
> Management does not respect the Board and consistently ignores
> the Board's advice and concerns.

*     *     *

> I could go on, but suffice it to say that I do not have confidence in
> our Management team.

161.    Zona also believed the Officer Defendants often engaged in obstructionist
behavior, noting one instance where "[f]or several days subsequent to the Board meeting,
Management constructed barriers to implementing the Boards [sic] decisions instead of
determining the best way to implement them."

162.    Zona's concerns were later echoed by Einhorn who stated in an August 13, 2006
email that "pretty much every piece of analysis and data we receive is agenda driven and
unreliable."

163.    In addition to this atmosphere of mutual distrust, there were differences between
the Independent Directors and Officer Defendants as to fundamental Company issues, such as
the Company's strategic direction and the liquidity pressures it faced.

164.    A divide existed between the Independent Directors and Officer Defendants
regarding the appropriate business/financial model for the Company. Some of the Independent
Directors wanted a model that focused on the Company's sale of mortgage loans at the expense
of building the REIT Portfolio and thereby generating more short-term income. Some of the
Officer Defendants favored continued growth of the REIT Portfolio.

165.    A continuing and contentious topic between the Independent Directors and
Officer Defendants concerned New Century's dividends and stock buy-backs. The Independent

Directors favored lower dividends and increased stock buy-backs. Some of the Officer Defendants preferred an emphasis on increased dividends with no stock buy-backs.

166.    In 2005 and 2006, the Defendants caused New Century *both* to regularly increase its quarterly dividend *and* to spend nearly $100 million to buy back New Century stock.

167.    The consequences to the Company of these actions were later described by one of the Director Defendants to Forster:

> Have we gotten to where the sale of the REIT portfolio is more defensive than offensive? ABSOLUTELY – THAT'S THE REAL MEANING OF A LIQUIDITY CRISIS. Are we at this point because we used $100 million of our liquidity in the last 14 months for stock repurchases despite the knowledge that these repurchases could potentially put us below our liquidity targets (which it did)? WE ARE WHERE WE ARE – THE VALUE OF LOOKING BACK IS NOT CLEAR TO ME, BUT THAT SAID IT'S WORTH POINTING OUT THAT WE ARE AT THIS POINT BECAUSE OF A STUPID DIVIDEND POLICY THAT USED A LOT MORE CAPITAL THAN OUR REPURCHASES OF STOCK DID.

168.    The mutual distrust that existed between the Independent Directors and Officer Defendants, among other things, prevented each of them from discharging their duties and responsibilities in good faith, with due care, and in the Company's best interests.

169.    This mutual distrust also had a materially adverse and costly effect on the Company.

**H.    New Century's Public Announcements**

170.    On February 7, 2007, a day before its 2006 fourth quarter and year-end results were scheduled to be released, New Century announced publicly that it needed to restate its earnings for the first three quarters of 2006 due to its failure to account properly for probable expenses and losses in its repurchase reserve in accordance with generally accepted accounting principles ("GAAP"). In particular, New Century explained that "the company's methodology

for estimating the volume of repurchase claims to be included in the repurchase reserve calculation did not properly consider, in each of the first three quarters of 2006, the growing volume of repurchase claims outstanding that resulted from the increasing pace of repurchase requests that occurred in 2006, compounded by the increasing length of time between the whole loan sales and the receipt and processing of the repurchase request."

171.    New Century further explained in that announcement that "errors leading to these restatements constitute material weaknesses in its internal control over financial reporting for the year ended December 31, 2006."

172.    On March 2, 2007, New Century filed a notification of late filing with the SEC, in which it stated, among other things, that:

> Although a full review is ongoing, the Company currently expects that the modifications to the allowance for loan repurchase losses will result in restated net income for the first three quarters of 2006 that is significantly lower than previously reported in the Company's 2006 interim financial statements.
>
> *        *        *
>
> Although the Company's mortgage loan origination volume increased in 2006 when compared to 2005, the Company's results of operations for the quarter and year ended December 31, 2006 will reflect declines in earnings and profitability when compared to the same periods in 2005.  The Company currently expects that it will report a pretax loss for both the fourth quarter and full year ended December 31, 2006.
>
> *        *        *
>
> The Company's net gain on sale of its mortgage loans declined over the course of 2006 due primarily to (i) increased exposure to repurchase loans from whole loan buyers; (ii) increases in the percent of loans rejected by whole loan investors during their due diligence review prior to purchase and (iii) increasing severity of loss upon disposition of repurchased and other loans in discounted loan sales.

173. New Century shortly thereafter announced that federal investigators had launched probes into the timing of New Century stock sales by several of the Defendants, including the Inside Directors.

174. On March 12, 2007, New Century reported that certain lenders discontinued financing for the Company. New Century further disclosed that it lacked the liquidity to keep pace with repurchase requests.

175. Following these public announcements, New Century's stock fell by more than 90% and was delisted by the New York Stock Exchange.

176. On May 24, 2007, New Century publicly announced that the Audit Committee had concluded "that it is more likely than not that . . . errors in the aggregate resulted in a material overstatement of pretax earnings in the [Company's] 2005 Financial Statements," and that the Board had concluded "that the 2005 Financial Statements should no longer be relied upon."

**I.      New Century's Bankruptcy**

177. On April 2, 2007, the Debtors filed for bankruptcy to liquidate their assets.

178. On June 1, 2007, the Bankruptcy Court issued an order directing the United States Trustee to appoint an examiner to, among other things, "investigate any and all accounting and financial statement irregularities, errors or misstatements, including but not limited to such irregularities, errors or misstatements that (i) gave rise to the announced need to restate [New Century's] financial statements for the first three quarters of 2006 and/or (ii) led [New Century's] management and Audit Committee to conclude that it was more likely than not that pre-tax earnings in the 2005 financial statements were materially overstated" and to prepare a report of such findings.

179. Michael J. Missal was thereafter appointed as the examiner (the "Examiner").

180.	Eight months after his appointment, the Examiner released a 551-page final report that was filed with the Bankruptcy Court on February 29, 2008 (the "Examiner's Report").  The Examiner's Report was released publicly on March 26, 2008.

**J.	Defendants' Breach of Duties in the Company's
Origination and Underwriting of Loans**

181.	As further alleged herein, Defendants breached their duties of loyalty, due care, diligence, oversight, good faith, and supervision in the Company's origination and purchase of mortgage loans by, among other things:

(a)	emphasizing increased loan production that was known to be achievable only by the Company offering non-traditional, high-risk loan products to unqualified borrowers;

(b)	failing to address known deficiencies in the Company's origination process that, among other things, caused investors to kick-out loans at increased rates;

(c)	failing to address known deficiencies in the Company's underwriting practices; and

(d)	failing to act after it became known by 2004 that the Company's high-risk loan products and deficient underwriting standards were resulting in increased losses to the Company.

182.	The Defendants grossly and recklessly, if not consciously and intentionally, disregarded their duties and responsibilities to New Century, NCMC, Home123, NC Capital, and the Company, and failed to act (a) in the face of known duties owed to the Company, and (b) in the honest belief that their actions or inactions were taken in the best interests of the Company.

183.	The Defendants' actions and inactions were neither the consequence of an informed decision made with due care nor a good faith exercise of prudent business judgment to protect and promote the Company's best interests.

### 1. Defendants' Emphasis on Increased Loan Production

184. The Defendants, beginning in at least 2004, aggressively managed and directed the Company to substantially increase the volume of mortgage loans originated and produced.

185. To achieve this substantial increase in loan production in the market the Company faced in 2004 and after, it was necessary for the Company to increasingly rely upon the origination and purchase of non-traditional, high-risk loan products provided to borrowers with a high-risk of default.

186. The Defendants, beginning in 2004, knowingly directed and/or approved the increase in the Company's origination and purchase of high-risk mortgage loan products to high-risk borrowers.

187. The Officer Defendants and Board Defendants owed duties to New Century and the Company, including duties to implement effective controls and procedures to manage, address and minimize known risks in originating or purchasing loans and in selling or securitizing those loans on the secondary mortgage market.

188. The NCMC Defendants owed duties to NCMC, New Century and the Company, including duties to implement effective controls and procedures to manage, address and minimize known risks in the loans originated or purchased by NCMC.

189. The Home123 Defendants owed duties to Home123, New Century and the Company, including duties to implement effective controls and procedures to manage, address and minimize known risks in the loans originated or purchased by Home123.

190. The NC Capital Defendants owed duties to NC Capital, New Century and the Company, including duties to implement effective controls and procedures to manage, address and minimize known risks in the loans sold or securitized by NC Capital.

191.    The Defendants each knew or should have known that their failure to discharge their duties, including to implement effective controls and procedures to manage, address and minimize known risks to the Company, would have severe adverse consequences to the Company and result in lower sales prices, less interest income, greater kick-outs and repurchases and unprofitable loans on the Company's balance sheet.

192.    As further alleged herein, the Defendants each breached their duties, including those to implement effective controls and procedures to manage, address and minimize known risks to the Company in the origination and purchase of high-risk mortgage loan products to high-risk borrowers.

193.    As further alleged herein, Defendants were each aware or should have been aware by at least 2004 that the Company was incurring losses because of deficiencies in the Company's origination and purchase of loans and underwriting practices.

194.    Even after the Defendants each became aware or should have become aware that the Company was incurring losses because of deficiencies in the Company's origination and purchase of loans and underwriting practices, the Defendants each failed to act in the face thereof or to discharge their duties.

195.    The Company was damaged as a direct and proximate result of the Defendants' continuing breach of their duties.

**2.      The Company's Origination of High-Risk Loan
         Products and Deficient Underwriting Standards**

196.    Between 2004 and 2006 and pursuant to the Directors' emphasis on increased loan production, the volume of mortgage loans originated and purchased by the Company increased to $42 billion in 2004, $56 billion in 2005 and $60 billion in 2006.

197.    To achieve such increased loan production and at the Defendants' direction, non-traditional loan products, such as "interest-only loans", "stated income loans", "80/20 loans" and "ARM loans", became an increasingly important and larger part of the Company's mix of loan products beginning in 2004.

198.    "Interest-only loans", which expose borrowers to drastic payment spikes when principal becomes due, peaked at 38.5% of the Company's loan origination in June 2005, up from 21.04% in June 2005, and 2.77% in December 2003.  For the nine months ended September 30, 2006, the Company originated over $7.5 billion in such loans.

199.    The risks inherent in these "interest-only loans" were exacerbated because the Company approved such loans based only on the borrower's ability to pay the initial interest on the loan and not on their ability to pay interest plus principal.

200.    "Stated income loans" (also known as "liars' loans") were not documented by W-2 forms or bank statements.  Instead, the prospective borrower would "state" his or her income in the loan application and the Company would accept such a representation, in many instances with little or no independent verification.  Between 2004 and 2006, over 42% of all loans made by the Company were stated income loans.

201.    As early as October 2004, an email copied to Cloyd stated that "[w]e know that Stated Income loans do not perform as well as Full Doc[umentation] loans." (emphasis in original)  In January 2005, the Officer Defendants were advised by one of the Company's employees, "[t]o restate the obvious, a borrower's true income is not known on Stated Income loans so we are unable to actually determine the borrowers [sic] ability to afford a loan."

202.    Beginning in 2004, the Company began to increase its origination of "80/20 loans."  These loans were 100% loan-to-value ("LTV"), with an 80% first lien mortgage and a

20% second lien mortgage, and grew from less than 10% of the Company's loan originations in 2003, to 20% in June 2004, 34% in June 2005 to 35% in 2006.

203.    Between 2004 and 2006, over 70% of the Company's loan originations were adjustable rate mortgages ("ARM"), which included "interest-only loans" as discussed above, and 2/28 and 3/27 ARM loans.

204.    A 2/28 or 3/27 ARM loan typically would have a fixed low interest rate (often called a "teaser rate") for the first two or three years and then would adjust at least annually to prevailing market rates.  They were made by the Company based on the borrower's ability to pay at the initial "teaser" rate and not on their ability to pay the loan when adjusted.

205.    The Company made many of these loans with the expectation that the borrower would refinance the loan before the interest rate was adjusted from the initial "teaser" rate.

206.    As Theologides warned others at the Company in 2004, "[the Company] should not be making loans where the inability to refinance after 2 years leaves the borrower at very high-risk of default even under modest interest rate increases."

207.    Many of the loans originated by the Company between 2004 and 2006 combined several high-risk products, such as providing an interest-only loan based on stated income, thereby significantly increasing the risk of the borrower's default.

208.    At the same time it was marketing and extending these risky loan products, the Company was also increasingly deviating from prudent underwriting standards.  This greatly increased the risk of borrower defaults and resulting losses to the Company.

209.    According to the Examiner's Report, several of the Defendants advised that the Company's only measure of loan quality when making a loan was whether the loan could be ultimately sold or securitized to investors.  This sentiment was earlier voiced by New Century's

chief credit officer, who commented to Morrice in April 2004 that the Company had "no standard for loan quality."

210.    In response to a September 2004 memorandum from Morrice calling New Century's policy for exceptions to its underwriting standards "unclear", Cloyd responded, "[o]ur exception policy – do we have one?"

211.    The poor quality of the loans originated in 2004 and after by the Company were well known to Defendants.    As Forster stated in preparatory notes for an August 2005 Independent Director meeting, it "[f]eels like we're chasing volume/market share at any cost vs. controlling better for the right loans (good loans that can be sold profitably)."

212.    Despite frequent discussions between 2004 and 2006 regarding continually deteriorating loan quality and known deficiencies in the Company's underwriting practices, no meaningful responsive action was taken by the Defendants.

213.    Not until the fall of 2006 did Defendants finally begin to address issues such as high-risk loan products and lax or non-existent underwriting practices, but by then the Company had already suffered losses as a result of the Defendants' inaction.

214.    The Company's financial compensation structure reinforced a disregard for quality standards in the loans made by the Company.    Employees were trained at "CloseMore University" and financially rewarded for making risky, high cost loans, irrespective of the risk such loans posed for the Company.

215.    As early as 2004, the Officer Defendants recognized that compensation for loan origination needed to be tied to loan quality.    In September 2004, Morrice wrote in a memorandum that employee compensation should be tied to loan quality "<u>otherwise this has no teeth and continues to be an exercise in futility</u>". (emphasis in original)

216.    Yet by November 2006, New Century's Internal Audit Department noted that the commissions paid to the Company's employees based on loan production were not tied to the quality of the loans they produced.

**3.      Defendants' Continued Failure to Address Loan Quality Issues**

217.    From at least 2004 onward, the Defendants were aware of the increasing deterioration in the quality of the Company's loans and the resulting higher defaults and Company losses, but failed to discharge their duties and obligations to take action to address its known causes.

218.    Indeed, as late as February 7, 2007, Morrice wrote in an email: "I am concerned about whether we have a good feel for what we need to do on loan quality relative to profitability (not just GOS [gain on sale], but erosion and LAC [loan acquisition cost])."

219.    The Company produced monthly internal reports that were provided to the Defendants and which closely tracked investor kick-outs and EPDs - two key indicators of loan quality.

220.    The investor kick-out reports or "fall out reports" tracked the overall percentage of and reasons for the kick-outs. Other reports (including monthly Capital Market Reports) regularly tracked the trends in EPDs, including First Payment Defaults ("FPDs"), wherein borrowers failed to make even their first payment to the investor.

221.    FPDs were particularly important to the Company and closely watched by the Defendants since they suggested that the Company was making loans to borrowers who were not properly qualified for the particular loan product. As one New Century employee commented to Cloyd in December 2004:

> "FPDs are a clear indicator of loan performance and the earliest possible objective measure that we have."

222.    In addition, the Company conducted regular audits to assess its compliance with existing policies and procedures in the loan origination process through its Quality Assurance ("QA") Department and its Internal Audit Department.

223.    The QA Department conducted monthly audits of a percentage of the loans funded in the prior month to determine compliance with applicable New Century procedures. The results of these audits were reported monthly to the Loan Production Department and on a periodic basis to the Audit Committee.

224.    The Internal Audit Department also conducted field audits assessing the Company's compliance with regard to existing policies and procedures.  The results of these audits consistently reported "significant flaws" in the loan origination process.

(i)    **2004 Loan Quality Trends Known to Defendants**

225.    Since at least 2004, Defendants were aware that the Company was incurring substantial losses from investor kick-outs due to issues such as inadequate appraisals and missing loan documentation that needed to be addressed.  Defendants, however, failed to address these issues.

226.    Kick-outs thus increased from $1.5 billion in 2004 to $2.2 billion in 2005 and to $4.622 billion by the end of 2006.

227.    Between 2004 and 2006 more than 25% (or $2.5 billion) of rejected loans were due to appraisal-related problems and approximately $1 billion were due to missing loan documentation.

228.    In a September 7, 2004 email widely distributed in the New Century Production, Operations and Secondary Marketing Departments, the officer responsible for the kick-out reports stated:

> We are unfortunately seeing a very concerning trend in both Appraisal and Credit quality. . . . This severe a drop in execution clearly warrants a legitimate concern on everyone's part. . . .

229.    Following up on these kick-out rates, a senior New Century employee commented in an October 2004 email to Morrice and copied to Cloyd:

> The number one issue is <u>exceptions to guidelines</u>; . . . . Ambiguity (in guidelines) may have been common and even acceptable in the past, but in today's environment it is not by the investment community and it is becoming evident that it may very well be the root cause in many of our issues surrounding credit quality. (Emphasis in original).

230.    EPDs also were known by the Defendants to be on the rise, especially in the second half of 2004 when they increased 65% from 2003. FPDs alone increased over 50% between 2003 and 2004.

231.    From April 2004 to December 2004, the percentage of loans identified by the Company as having high-risk underwriting errors increased from approximately 12.5% to 24% of the loans. Missing loan documentation, which could have been at least substantially curtailed had the Defendants addressed its causes, was one of the most prevalent underwriting errors.

232.    Defendants were well aware that the Company had serious loan quality issues. In April 2004, New Century's Chief Credit Officer reported that "the QA results [pertaining to the loan origination processes] are still at unacceptable levels" and that "Investor Rejects [kick-outs] are at an incline as well."

233.    In a June 2004 email, Flanagan remarked that "we have so many issues pertaining to quality and process!"

234.    Throughout 2004, the Defendants were aware of, and frequently discussed, the deterioration in the quality of the Company's loans and the deficiencies in the Company's

underwriting policies.  They were also aware of the increasing losses the Company was incurring by reason thereof.

235.    The Defendants did not, however, take any effective action to address those issues.

**(ii)    2005 Loan Quality Trends Known to Defendants**

236.    In 2005, loan quality continued to decline and deficiencies continued to exist in New Century's underwriting practices.

237.    Investor kick-outs for all of 2005 totaled $2.281 billion, an increase of over $700 million from the prior year.

238.    For ten of the twelve months of 2005, the Company kick-out rates exceeded the five percent rate that was viewed internally at New Century as the highest acceptable kick-out rate.

239.    As in 2004, a primary reason for the investor kick-outs in 2005 was missing documentation which accounted for over 12% ($280 million) of kick-outs.  Had the Defendants acted to ensure the Company's own underwriting policies had been followed, these loans would not have been funded until the loan files were complete.

240.    The deterioration of the Company's loan quality, as measured by EPDs, also was dramatic.  EPDs for 2005 represented 8.3% of all loans originated by the Company as compared with 7.2% in 2004 and 4.38% in 2003.

241.    By at least September 2005, Defendants were aware that certain loan products (especially 80/20 loans) performed "worse than the other [Company] products."  Multiple data sources showed that 80/20 loans made in 2004 had four times the delinquency rates of non-80/20 loans, causing Flanagan to question, "thoughts on what to do with this information … pretty compelling."  In fact, nothing was done with the information and 80/20 loan production steadily

increased throughout 2005, reaching 35% of overall loan production by December 2005, up from 23.5% in 2004 and 9.1% in 2003.

242.    In 2005, the Internal Audit Department conducted nine field audits of the Company's loan origination processes, resulting in seven "Unsatisfactory" and two "Needs Improvement" ratings, as well as identification of numerous problems that constituted serious loan quality deficiencies.

243.    Rather than take action on these findings, Flanagan, the then-head of the Company's Loan Production Department, stated in a September 2005 email commenting on the "Unsatisfactory" ratings in the Internal Audit Department's field audit:

> I think the group who are receiving this e-mail needs to get together and discuss the operating center audits. If recollection is correct, ever singe [sic] audit completed has been unsatisfactory which to me sounds like we need to ammend [sic] policy as much as clean up our act. The financial results that have been ackomplished [sic] over the past few years are inconsistent with the audit results.

244.    These negative trends in the quality of loans originated and purchased by the Company were regularly reported to Defendants.  At an October 25, 2005 Audit Committee meeting it was reported that "First Payment Defaults appear to be on the rise" and "Second Payment Defaults continue to rise as well.  Going forward, it will be very important to monitor performance and see if this upward trend continues."

245.    The upward trend did continue throughout 2005 and into 2006.  But as in the prior year, no effective action was taken by Defendants to improve loan quality.

**(iii)    2006 Loan Quality Trends Known to Defendants**

246.    By reason of the Defendants' failure to take action in 2004 and 2005, loan quality dramatically worsened in 2006.

247.    Kick-out rates were above the five percent acceptable level for every month in 2006 reaching 14.95% ($4.6 billion) by year end.  Overall, kick-outs more than doubled in 2006 from 2005 and totaled in excess of $4 billion.  As in prior years, the same deficiencies were the primary reasons for the kick-outs, such as missing documentation and defective appraisals.

248.    Similarly EPDs continued the climb upward during 2006 reaching 16.82% in December 2006.

249.    In its January 2006 meeting, the Audit Committee discussed at length loan quality issues.

250.    Notwithstanding that discussion and the known need for action, no effective action was then taken by the Officer Defendants or insisted upon by the Audit Committee.

251.    It was not until late 2006, that Defendants began to tighten underwriting guidelines and eliminate certain loan products (such as eliminating 80/20 loans).  These actions, however, came too late.  By then, the Company had incurred (and thereafter would continue to incur) losses on billions of dollars of loans earlier originated.

252.    As late as January 2007, the Company's head of Loan Production commented that the Company's appraisal processes were "stale, [and that] we need to address them expeditiously."  In another email he stated, "we have been asking for 5 months, when can we attack appraisals and how?"

K.    **New Century's Lack of Internal Financial Controls**

253.    New Century was required to establish and maintain a system of internal controls over financial reporting sufficient to provide reasonable assurances, among other things, that transactions were recorded to permit the preparation of the Company's financial statements in accordance with GAAP.

254.     It was the duty of the Officer Defendants to devise and thereafter maintain and assess the effectiveness of New Century's system of internal controls over financial reporting, including internal accounting controls and financial reporting processes, as well as to prepare and accurately report the Company's financial results in conformance with GAAP.

255.     It was the duty and responsibility of the Director Defendants to monitor and oversee New Century's internal controls over financial reporting, including internal accounting controls and financial reporting processes, and the reporting of the Company's financial results.

256.     The effectiveness of New Century's system of internal controls over financial reporting and the Company's reported financial results were of critical importance to New Century and were directly related to the amount of dividends paid to New Century's shareholders (who included the Officer and Director Defendants); the amount of bonuses and other compensation paid to the Company's employees (including the Officer Defendants); the amount of New Century stock repurchased by New Century from its shareholders (who included the Officer and Director Defendants); and other Company financial and business decisions.

257.     The Company's Form 10-K for the year 2004 included certifications by Cole, Morrice and Gotschall as to New Century's internal controls over financial reporting.  New Century's Form 10-K for the year 2005 included certifications by Cole, Morrice and Dodge as to New Century's internal controls over financial reporting.

258.     The Officer and Director Defendants breached the duties and responsibilities they each owed to New Century to advise and thereafter maintain, assess, monitor, and oversee New Century's system of internal controls over financial reporting, and to prepare and accurately report the Company's financial results in conformance with GAAP.

259.     New Century publicly acknowledged in 2007 that there were material weaknesses and significant deficiencies in its system of internal controls over financial reporting in at least 2005 and 2006.

260.     New Century also publicly reported in 2007 that the Company's consolidated financial statements for the year-end 2005 (the "2005 Financial Statements") and interim financial statements for each of the first three quarters of 2006 (the "2006 Financial Statements", and together with the 2005 Financial Statements, the "Financial Statements") were not prepared in accordance with GAAP and were materially misstated.

261.     Specifically, New Century advised, among other things, that the Financial Statements:

    (a)    failed to properly account and report the repurchase reserve in accordance with GAAP;

    (b)    failed to properly account and report the lower of cost or market ("LOCOM") valuation adjustment for repurchased loans in accordance with GAAP;

    (c)    failed to properly account and report the valuation of residual interests in accordance with GAAP.

    (d)    materially understated the repurchase reserve, materially overstated the value of repurchased loans and materially overstated the value of residual interests;

    (e)    materially overstated pre-tax earnings; and

    (f)    should not be relied upon.

262.     The weaknesses and deficiencies that existed during at least 2005 and 2006 in New Century's system of internal controls over financial reporting included, but were not limited to, the following:

    (a)    failure to develop and document effective policies and procedures for performing estimates requiring the exercise of judgment, including the repurchase reserve and the valuation of residual interests;

(b)     failure to establish safeguards and controls to prevent the revision of or deviation from accounting policies and related assumptions without adequate supervision and review;

(c)     failure to establish safeguards and controls to ensure the remediation of identified internal control deficiencies;

(d)     failure to establish safeguards and controls to identify and process efficiently repurchase requests; and

(e)     failure to establish safeguards and controls to ensure that the repurchase reserve estimation process accounted for all outstanding repurchase requests.

263.    As a consequence of the above, New Century in 2005 and 2006 declared and paid dividends to shareholders (including the Officer and Director Defendants) and made bonus payments and awarded other compensation to employees (including the Officer Defendants) in excess of that which would have been paid had the Financial Statements been accurately stated.

264.    The breach of duties by the Officer and Director Defendants also resulted in New Century's expending tens of millions of dollars as the result of internal investigations, government investigations and the Examiner's investigation.

## L.     The Defendants Improperly Benefitted from their Breach of Duties

265.    The Defendants improperly benefited from the breach of their duties and obligations to New Century, NCMC, Home123, NC Capital, and the Company.

266.    The improper benefits received by the Defendants included, but were not limited to, the following:

(a)     dividend payments in excess of that to which they were entitled;

(b)     bonus payments and other compensation in excess of that to which they were entitled;

(c)     payments from New Century to repurchase their stock in excess of that which they would have received; and

(d)     payments received from their sale of New Century stock in the open market in excess of that to which they would have been entitled.

1.    **Dividends**

267.    New Century paid dividends in 2005 and 2006 in excess of that which would have been paid had the Defendants properly discharged their duties.

268.    For the period 2005 through the fourth quarter of 2006, New Century increased the dividends it paid by $.05 per share each quarter as set forth below:

| Period | Dividend |
|---|---|
| First Quarter 2005 | $1.50 |
| Second Quarter 2005 | $1.55 |
| Third Quarter 2005 | $1.60 |
| Fourth Quarter 2005 | $1.65 |
| First Quarter 2006 | $1.70 |
| Second Quarter 2006 | $1.75 |
| Third Quarter 2006 | $1.80 |
| Fourth Quarter 2006 | $1.85 |

269.    By reason of New Century's misstatement of the Financial Statements, the dividends paid in 2005, 2006 and 2007 (for the fourth quarter of 2006) were in excess of the amount which should have been paid.

270.    Defendants, each of whom owned shares in the Company, were direct and significant beneficiaries of these increasing dividend payments. In the aggregate, they personally received more than $50 million of dividend payments.

271.    Defendants received dividend payments in excess of the amount they would have received had they properly discharged their duties.

272.    As a result, a portion of the dividend payments that the Defendants received in 2005, 2006 and 2007 (for the fourth quarter of 2006) were undeserved and should be repaid to the Trust.

2. **Stock Sales**

273. Between 2005 and 2006, Defendants sold millions of dollars of personally-held New Century common stock.

274. In 2007, New Century announced that it had materially overstated its pre-tax earnings in 2005 and 2006.

275. As a consequence, the price of New Century stock was artificially inflated in 2005 and 2006.

276. For Cole, Morrice and Gotschall alone, their sales of New Century stock totaled over $52 million between May 2005 and November 2006.

277. The Defendants received more than they would have received had they properly discharged their duties.

278. As a result, any gains the Defendants reaped from such sales during 2005 and 2006 were undeserved, and should be repaid to the Trust.

3. **Bonuses**

279. Pursuant to employment agreements and the provisions of the Company's "2004 Performance Incentive Plan" (the "2004 Plan"), the Officer Defendants were entitled to receive base compensation plus various other forms of bonus and incentive compensation, including, among other things, cash bonuses, stock options, stock appreciation rights, restricted stock and stock bonuses.

280. In March 2005, the Company introduced a new incentive approach for senior executives (the "2005 Plan") awarding different combinations of the following:

      (a)    "Performance Accelerated Stock Options," which vested when New Century stock hit a designated price;

      (b)    "Performance Accelerated Restricted Stock," which vested when New Century reached consolidated pre-tax earnings targets;

(c)     "Dividend Equivalent Rights" ("DER"), which were based on New Century's cash dividends; and

(d)     for division heads in the loan production and servicing areas, "Performance Units," which vested if New Century's taxable REIT subsidiary reached pre-tax earnings targets.

281.    Under the 2004 and 2005 Plans (collectively, the "Bonus Plans"), New Century could grant stock, DERs or cash awards equal to a percentage of New Century's pre-tax net income under a special bonus formula based upon the ratio of New Century's pre-tax net income to its average shareholder's equity, measured over a six-month and twelve-month period. Different Bonus Plans were in effect for (a) the Inside Director Defendants and Flanagan, (b) so-called Section 16 Officers, including Cloyd, Dodge, Eckroth and Theologides, and (c) Assistant Vice Presidents and above management.

282.    Although the calculation of individual bonuses varied with regard to position held, the computation of virtually all bonuses under the Bonus Plans was based in some part on the Company's earnings.

283.    As a consequence of New Century's misstatement of its Financial Statements, New Century's earnings for 2005 and 2006 were inflated and materially misrepresented New Century's true financial condition.

284.    Overstated earnings resulted in the Company's payment of millions of dollars in unearned and excessive bonuses to Officer Defendants under the Bonus Plans (the "Bonus Overpayments").

285.    When the Company's earnings are restated for 2005 and 2006, as determined by the Examiner, both the Company's pre-tax net income and the bonus compensation to be received by the Officer Defendants is significantly reduced.

286.    As set forth below, the Officer Defendants received Bonus Overpayments totaling at least $5 million in 2005 and $4.3 million in 2006:

|  | 2005 Bonus Overpayment | 2006 Bonus Overpayment |
| --- | --- | --- |
| Robert Cole | 938,275 | 478,170 |
| Brad Morrice | 938,275 | 1,003,439 |
| Edward Gotschall | 938,275 | 149,428 |
| Patrick Flanagan | 938,275 | -0- |
| Kevin Cloyd | 451,023 | 1,021,873 |
| Patti Dodge | 400,004 | 536,612 |
| Joe Eckroth | 90,444 | 579,973 |
| Terry Theologides | 378,053 | 537,301 |
|  |  |  |
| **Total Amounts** | **$5,072,624** | **$4,306,796** |

287.    The Officer Defendants received bonuses and other compensation in excess of the amount they would have received had they properly discharged their duties.

288.    In addition to the Officer Defendants, New Century made bonus overpayments and awarded other compensation to other employees of the Company for 2005 and 2006 that totaled in excess of $20 million (the "Employee Bonus Overpayment") that would not have been paid had the Defendants properly discharged their duties.

289.    All payments received by the Officer Defendants in 2005 and 2006 under the Bonus Plans (including the Bonus Overpayment) were undeserved and must be repaid.

290.    The Employee Bonus Overpayments are recoverable from the Officer Defendants by reason of the Officer Defendants' breach of their duties and obligations to the Company.

**4.    Stock Repurchases**

291.    In 2005 and 2006, New Century repurchased its stock at artificially inflated prices.

292.     Upon information and belief, some or all of the Defendants sold their stock to New Century and received in exchange an amount that they would not have received had the Defendants properly discharged their duties.

293.     As a result, the inflated portion of the stock price paid by New Century and received by some or all of the Defendants was undeserved and should be repaid to the Trust.

### First Claim For Relief - Breach of Fiduciary Duty
### Against Officer and Director Defendants
### (Incorporating All Previous Allegations)

294.     By reason of their positions as officers and directors and because of their ability to control the business and corporate affairs of New Century, each of the Officer and Director Defendants owed New Century and the Company duties, including those of loyalty, care, trust, diligence and good faith, in the discharge of their obligations and responsibilities to New Century and the Company.

295.     The Officer and Director Defendants, singularly and in concert, breached their duties to New Century and the Company by, among other things, acting in conscious disregard thereof and in a grossly negligent and reckless manner.

296.     As a direct and proximate result of the Officer and Director Defendants' aforesaid breaches, New Century and the Company have sustained damages.

297.     By reason of the foregoing, the Trustee is entitled to judgment against the Officer and Director Defendants, jointly and severally, in an amount to be determined by the Court but estimated to be not less than $150 million, together with punitive damages.

## Second Claim For Relief - Waste of Corporate Assets
## Against Officer and Director Defendants
## (Incorporating All Previous Allegations)

298.     The Officer and Director Defendants, singularly and in concert, breached their duties to New Century by acting in conscious disregard thereof and in a grossly negligent and reckless manner.

299.     As the direct and proximate result of the improper conduct described herein, the Officer and Director Defendants wasted valuable company assets, including but not limited to the payment of excessive dividends, bonuses, excessive payments to repurchase its stock, and the dissipation of corporate assets.

300.     As a direct and proximate result of the Officer and Director Defendants' waste of corporate assets, the Trustee is entitled to judgment against the Officer and Director Defendants, jointly and severally, in an amount to be determined by the Court but estimated to be not less than $150 million, together with punitive damages.

## Third Claim For Relief - Breach of Fiduciary Duty
## Against NCMC Defendants
## (Incorporating All Previous Allegations)

301.     By reason of their position as officers and directors of NCMC and their ability to control the business and corporate affairs of NCMC, the NCMC Defendants owed NCMC, New Century and the Company duties, including those of loyalty, care, trust, diligence and good faith, in the discharge of their obligations and responsibilities.

302.     The NCMC Defendants, singularly and in concert, breached their duties to NCMC, New Century and the Company by acting in a conscious disregard thereof and in a grossly negligent and reckless manner.

303. As a direct and proximate result of the NCMC Defendants' aforesaid breaches, NCMC, New Century and the Company have been damaged.

304. By reason of the foregoing, the Trustee is entitled to judgment against the NCMC Defendants, jointly and severally, in an amount to be determined by the Court but estimated to be not less than $150 million, together with punitive damages.

## Fourth Claim For Relief - Breach of Fiduciary Duty
### Against Home123 Defendants
### (Incorporating All Previous Allegations)

305. By reason of their position as officers and directors of Home123 and their ability to control the business and corporate affairs of Home123, the Home123 Defendants owed Home123, New Century and the Company duties, including those of loyalty, care, trust, diligence and good faith, in the discharge of their obligations and responsibilities.

306. The Home123 Defendants, acting singularly and in concert, breached their duties to Home123, New Century and the Company by acting in a conscious disregard thereof and in a grossly negligent and reckless manner.

307. As a direct and proximate result of the Home123 Defendants' aforesaid breaches, Home123, New Century and the Company have been damaged.

308. By reason of the foregoing, the Trustee is entitled to judgment against the Home123 Defendants, jointly and severally, in an amount to be determined by the Court but estimated to be not less than $150 million, together with punitive damages.

## Fifth Claim For Relief - Breach of Fiduciary Duty
### Against NC Capital Defendants
### (Incorporating All Previous Allegations)

309. By reason of their positions as officers and directors and their ability to control the business and corporate affairs of NC Capital, the NC Capital Defendants owed NC Capital,

New Century and the Company duties, including those of loyalty, care, trust, diligence and good faith in the discharge, of their obligations and responsibilities.

310.     The NC Capital Defendants, acting singularly and in concert, breached their duties to NC Capital, New Century and the Company by acting in conscious disregard thereof and in a reckless and grossly negligent manner.

311.     As a direct and proximate result of the NC Capital Defendants' aforesaid breaches, NC Capital, New Century and the Company have been damaged.

312.     By reason of the foregoing, the Trustee is entitled to judgment against the NC Capital Defendants, jointly and severally, in an amount to be determined by the Court but estimated to be not less than $150 million, together with punitive damages.

### Sixth Claim For Relief - Unjust Enrichment
### Against Defendants
### (Incorporating All Previous Allegations)

313.     As a direct and proximate result of the aforesaid breaches of their duties owing to New Century, NCMC, Home123, NC Capital, and the Company, the Defendants wrongfully received direct and indirect benefits from New Century, NCMC, Home123, NC Capital, and the Company to which they were not entitled including, but not limited to, payment of excessive bonuses, dividends and the receipt of excess monies from the sale of New Century stock.

314.     The Defendants have been unjustly enriched, at the expense of and to the detriment of New Century, NCMC, Home123, NC Capital, and the Company.

315.     Equity requires that the Defendants disgorge and repay the amount by which they have been unjustly enriched.

316.     By reason of the foregoing, the Trustee is entitled to judgment against the Defendants, jointly and severally, in an amount to be determined at trial.

## Seventh Claim For Relief - Fraudulent Conveyance
## Against Officer Defendants
## (Incorporating All Previous Allegations)

317.    The Officer Defendants received bonus payments from the Company in 2005 and 2006 based in whole or in part upon the Company's purported net income in those years.

318.    Upon information and belief, the Company's actual net income in 2005 and 2006 was less than the reported net income that purportedly justified the incentive bonuses paid.

319.    Upon information and belief, the Company received less than fair consideration and reasonably equivalent value in exchange for the bonuses.

320.    Upon information and belief, the Officer Defendants are statutory insiders under Bankruptcy Code § 101(31)(B)(ii).

321.    Upon information and belief, the bonuses paid to the Officer Defendants were paid pursuant to employment agreements.

322.    Upon information and belief, the bonuses that were paid to the Officer Defendants were not in the ordinary course of business.

323.    By reason of the foregoing, all or a portion of the bonus payments made in 2005 and 2006 to the Officer Defendants constitute fraudulent conveyances under Bankruptcy Code §§ 544 and 548(a)(1)(B)(ii)(IV).

324.    By reason of the foregoing, and pursuant to Bankruptcy Code § 550, the Trustee is entitled to (a) have all or a portion of the bonus payments set aside and recover the value of the bonus payments set aside, plus interest thereon pursuant to law, from the Officer Defendants in an amount to be proven at trial; and/or (b) attach or levy execution upon the assets so transferred for the benefit of the Trust.

**Eighth Claim For Relief – Money Had And Received/Mistake**
**Against Officer Defendants**
**(Incorporating All Previous Allegations)**

325. All or a portion of the bonuses paid by the Company to each of the Officer Defendants in 2005 and 2006 was paid as a result of mistake.

326. Equity requires that all or such portion of the bonuses paid by the Company to each of the Defendants in 2005 and 2006 be returned.

327. By reason of the foregoing, the Trustee is entitled to judgment against the Officer Defendants, jointly and severally, in an amount to be determined at trial.

**Ninth Claim For Relief - Preferential Transfer**
**Against the Preference Defendants**
**(Incorporating All Previous Allegations)**

328. On or within 90 days prior to the Petition Date (the "Preference Period"), one of the Debtors made one or more transfers of an interest to the Preference Defendants, as set forth on Exhibit "A" annexed hereto.

329. Each of the transfers identified in Exhibit "A" reflect the Trustee's present knowledge of the transfers made to the Preference Defendants by the Debtors during the Preference Period. During the course of this proceeding, the Trustee may learn (through discovery or otherwise) of additional transfers made by the Debtors to any or all of the Preference Defendants during the Preference Period. The Trustee is seeking to avoid and recover all such transfers, whether such transfers presently are reflected on Exhibit "A" or not. Collectively, all transfers made by the Debtors to or for the benefit of any or all of the Preference Defendants during the Preference Period (whether such transfers presently are reflected on Exhibit "A" or not) are referred to herein as the "Transfers."

330. The Transfers were made on or within 90 days prior to the Petition Date.

331.    The Transfers each were a transfer of an interest in property of one or more of the Debtors.

332.    The Transfers were made to or for the benefit of the respective Preference Defendant recipients.

333.    The Transfers were made for or on account of antecedent debts owed to the respective Preference Defendant recipients by one or more of the Debtors before the time the Transfers were made.

334.    The Transfers were made while the Debtors were insolvent.

335.    The Transfers enabled the respective Preference Defendant recipients to receive more than they would have received if: (a) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (b) the Transfers had not been made; and (c) the respective Preference Defendants received payment on account of the debt paid by the Transfers to the extent provided by the provisions of the Bankruptcy Code.

336.    The Transfers constitute preferential transfers which should be avoided as preferences pursuant to Bankruptcy Code § 547 and are recoverable from the Preference Defendants pursuant to Bankruptcy Code § 550.

## Tenth Claim for Relief - Fraudulent Transfer Claim
## Against the Preference Defendants
## (Incorporating All Previous Allegations)

337.    The Trustee brings this claim in the alternative in the event that one or more of the Preference Defendants asserts that one or more of the Transfers was not made on behalf of a Debtor other than the Debtor that owed the corresponding antecedent debt.

338.    The Transfers constitute transfers of an interest of the transferring Debtor(s) in property.

339. The transferring Debtor(s) received less than a reasonably equivalent value in exchange for the Transfers.

340. The transferring Debtor(s): (i) were insolvent on the date that the Transfers were made, or became insolvent as a result of such Transfers, (ii) were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Debtors was an unreasonably small capital, or (iii) intended to incur, or believed that they would incur, debts that would be beyond the Debtors' ability to pay as such debts matured.

341. The Transfers constitute fraudulent transfers which should be avoided pursuant to Bankruptcy Code §§ 544 and 548 and applicable state law and are recoverable pursuant to Bankruptcy Code § 550.

## Eleventh Claim for Relief - Disallowance of Claims
## Against Defendants and Preference Defendants
## (Incorporating All Previous Allegations)

342. The Debtors' schedules and financial records indicate that one or more of the Defendants may be a creditor of the Debtors.

343. One or more of the Defendants are individuals and/or entities from which property is recoverable under Bankruptcy Code § 550 and are transferees of transfers avoidable under Bankruptcy Code §§ 547 and/or 548.

344. Defendants have not paid the amount(s), or turned over such property, for which one or more of the Defendants are liable under Bankruptcy Code § 550.

345. To the extent that one or more of the Defendants currently possesses filed or scheduled claims against the Debtors, whether pre-petition or administrative (collectively, the

"Claims"), the Claims should be disallowed until the Transfers are repaid in full to Plaintiff pursuant to Bankruptcy Code § 502(d).

**WHEREFORE,** the Trustee demands judgment against the above-described defendants as follows:

    (a)    upon its first claim for relief against the Officer and Director Defendants, jointly and severally, in an amount to be determined by the Court but estimated to be not less than $150 million, together with punitive damages;

    (b)    upon its second claim for relief against the Officer and Director Defendants, jointly and severally, in an amount to be determined by the Court but estimated to be not less than $150 million, together with punitive damages;

    (c)    upon its third claim for relief against the NCMC Defendants, jointly and severally, in an amount to be determined by the Court but estimated to be not less than $150 million, together with punitive damages;

    (d)    upon its fourth claim for relief against the Home123 Defendants, jointly and severally, in an amount to be determined by the Court but estimated to be not less than $150 million, together with punitive damages;

    (e)    upon its fifth claim for relief against the NC Capital Defendants, jointly and severally, in an amount to be determined but not less than $150 million, together with punitive damages;

    (f)    upon its sixth claim for relief against the Defendants, jointly and severally, in an amount to be determined;

    (g)    upon its seventh claim for relief against the Officer Defendants, jointly and severally, in an amount to be determined;

    (h)    upon its eighth claim for relief against the Officer Defendants, jointly and severally, in an amount to be determined;

    (i)    upon its ninth claim for relief against the Preference Defendants in the amount of the Transfers, plus interest thereon;

    (j)    upon its tenth claim for relief against the Preference Defendants in an amount to be determined, plus interest thereon;

    (k)    upon its eleventh claim for relief against Defendants and Preference Defendants by way of disallowing any claims of the defendants against the Debtors under Bankruptcy Code § 502(d);

(l)   for reimbursement of the costs and expenses of this action including reasonable attorneys' fees; and

(m)   for such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
       April 1, 2009

BENESCH, FRIEDLANDER, COPLAN
& ARONOFF LLP

/s/ Raymond H. Lemisch
Raymond H. Lemisch (No. 4204)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone:     (302) 442- 7010
Facsimile:     (302) 442-7012
rlemisch@beneschlaw.com

- and -

HAHN & HESSEN LLP

John P. McCahey, Esq.
Mark S. Indelicato, Esq.
Maria A. Arnott, Esq.
488 Madison Avenue
New York, NY 10022
Telephone:     (212) 478-7200
Facsimilie:    (212) 478-7400

*Co-Counsel for The New Century
Liquidating Trust and Reorganized
New Century Warehouse Corporation*